**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **RIGHTLINE, LLC**<br>950 Falcon Drive<br>Malden, Missouri 63863<br><br>Plaintiff<br><br>v.<br><br>**CORTEVA, INC.**<br>c/o The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, New Castle County<br>Delaware 19801<br><br>Defendant | * | Civil Action No. |

* * * * * * * * * * *

## COMPLAINT

RightLine, LLC ("RightLine" or "Plaintiff"), by its undersigned counsel, respectfully brings this Complaint against Defendant Corteva, Inc. ("Corteva") for violations of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, and in support thereof, states and alleges as follows:

## INTRODUCTION

1. This is an antitrust action to restrain, and recover damages resulting from an illegal anti-competitive scheme implemented by Corteva to block entry of generic competitive alternatives to Corteva's branded products comprising the active ingredient Dithiopyr, a specialty pre-emergent and post-emergent herbicide used exclusively in the turf and ornamental market throughout the United States to control unwanted grasses and broad leaf weeds, like crab grass, in turf, golf courses, sports fields, sod farms, lawns, parks, greenhouses, and nurseries, among others. This scheme results in

supra-competitive prices wherein Corteva's end-user prices for certain Dithiopyr-containing products are as much as 35% higher than those charged by RightLine for an equivalent product.

2. There is no meaningful economic or functional substitute to Dithiopyr given its broad spectrum, fast acting nature, and residual soil presence combined with both pre- and post-emergent control of major turf weeds. RightLine is a generic supplier of herbicides and a direct competitor of Corteva in the Dithiopyr-containing product market, offering generic alternatives to Corteva's branded formulated Dithiopyr-containing product that Corteva markets under the name "Dimension." RightLine's generic alternative is marketed as RightLine Dithiopyr 2EW.

3. Corteva has accomplished this anti-competitive scheme through a web of annual exclusionary loyalty programs it has implemented with the nation's primary and most efficient and cost-effective channels for the distribution and sale of Dithiopyr-containing products, consisting of eight large national distributors, regional independent distributors, and one independent buying group that collectively account for more than 95% of the total amount of Dithiopyr-containing products sold in the United States. Through these exclusive dealing agreements with the primary channels of national distribution, Corteva has substantially foreclosed and lessened competition in a substantial share of the line of commerce for sale of Dithiopyr-containing products in the turf and ornamental market, effectively locking up for itself viable access to the nation's key lines of distribution for Dithiopyr in the turf and ornamental market and thereby preventing meaningful competition. This exclusionary conduct has enabled Corteva to preserve and maintain monopoly power over, and charge supra-competitive prices for, its Dithiopyr-containing products and deprive generic competitors, such as RightLine, of the opportunity to have the minimum economies of scale necessary to compete, resulting in injury to RightLine's business and property, irreparable harm to RightLine because there is no way to fully measure RightLine's lost opportunities to compete, and antitrust injury to end-user

consumer customers through both resulting higher prices for turf-protection products containing Dithiopyr than would prevail in a freely competitive marketplace and their loss of the benefits of free and open competition and choice.

## PARTIES

4. Plaintiff RightLine is a limited liability company organized and existing under the laws of the State of Missouri, with its principal place of business in Malden, Missouri.

5. Defendant Corteva, Inc. is a publicly held, for-profit corporation organized and existing under the laws of the State of Delaware with its principal place of business in Indianapolis, Indiana

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 26, because this action arises under Section 3 of the Clayton Act, 15 U.S.C. § 14, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

7. The Court has personal jurisdiction over Corteva pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 because Corteva is an inhabitant of this Judicial District by virtue of its incorporation in the State of Delaware and also because it may be found and transacts business in the State of Delaware.

8. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(1) and (c)(2) because Corteva is an inhabitant of and also may be found, transacts business, and resides in this State and District.

## FACTS COMMON TO ALL COUNTS

### I. The Market, Corteva's Monopoly and Market Power, and Industry Background

9. The relevant markets for this action are the sale of Dithiopyr-containing herbicide products in the United States turf and ornamental market and, within that market, their sale through the nation's primary, most efficient, and cost-effective channels of distribution consisting of eight large national distributors, regional independent distributors, and one independent buying group that account for at least 95% of such sales.

10. Defendant Corteva is the former patent owner and the dominant manufacturer and supplier of products containing the active ingredient Dithiopyr for sale in the United States turf and ornamental market, holding monopoly and market power, with its predecessor company Dow Agro Sciences having developed, and obtaining a United States patent for Dithiopyr as an active ingredient. Upon information and belief, Corteva has, and has maintained, an approximate 95% share of sales of Dithiopyr in the United States professional turf and ornamental market.

11. The United States patent for Dithiopyr expired over two decades ago and the active ingredient is no longer entitled to exclusive use and sale protection under the United States patent laws.

12. In March 2023, the Environmental Protection Agency (the "EPA") issued RightLine a product registration under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA") for the sale of RightLine's generic Dithiopyr product known as RightLine Dithiopyr 2L, marketed as RightLine Dithiopyr 2 EW. While having similar effectiveness on the control and eradication of certain weeds, RightLine's Dithiopyr 2 EW is lower odor, thus making it more popular among users than Corteva's Dithiopyr-containing products which have a fairly pungent odor upon application.

13. Following registration under FIFRA, RightLine launched the sale of RightLine's generic Dithiopyr 2EW in the Spring of 2024, becoming a direct competitor of, and potential threat to, Corteva.

14. The fact that generic Dithiopyr has had a *de minimus*, if not non-existent, market share at major distributors is a shocking distortion of a competitive marketplace and flies in the face of the regulatory scheme created by FIFRA, which created an eased regulatory environment for off-patent herbicides, fungicides, and insecticides (collectively, known as pesticides in the industry) to enter the market with the express intention of providing faster price competition.

15. Specifically, FIFRA permits manufacturers of off-patent active ingredients such as Dithiopyr to rely on the same toxicology and environmental impact data as the original data generator (in this case Corteva) through a data compensation program for data holders. The express purpose of this regulatory scheme is to ease the introduction in the market of substantially similar generic versions of regulated products no longer protected by a patent because competition with generics will inevitably result in lower prices to customers. RightLine's manufacturer followed the FIFRA framework and paid data compensation to Corteva (as the original data holder), which allowed RightLine's generic Dithiopyr to enter the U.S. market. Notwithstanding the significant amounts paid for data compensation to enter the market with a generic Dithiopyr product, Corteva has maintained its exclusionary loyalty program to maintain its monopoly; a practice that flies in the face of FIFRA's regulatory scheme to encourage the entry of generic competition.

**II. Corteva's Unlawful Exclusionary Conduct**

16. Since it began the sale of its generic Dithiopyr-containing products, RightLine's efforts to sell its competing lower cost, lower odor formulation product have been faced with, and stifled by, Corteva's implementation of exclusivity agreements it calls "loyalty programs" with the

distributors comprising the nation's primary and most efficient channels of distribution, pursuant to which Corteva makes "loyalty" payments in the form of conditional rebates to those distributors on the condition they do not sell any Dithiopyr-containing products acquired from other sources. As outlined below, these restrictive "loyalty" programs induce these distributors to deal exclusively with Corteva and have the practical effect of severely restricting and, in many instances, entirely excluding RightLine's lower price generic alternative from this critical and most efficient distribution channel. Many distributors, as outlined further below, have confirmed these restrictions conveying to RightLine that they cannot carry any generic Dithiopyr products because of their loyalty agreements with Corteva.

17. In addition to conditioning its loyalty payments on the distributors' agreements to exclude generic alternatives to Corteva's Dithiopyr-containing products from their distribution offerings, and to ensure compliance with its loyalty programs, Corteva has undertaken, and continues to undertake, concerted action to ensure adherence by the distributors. For example, it is believed that Corteva threatens to discontinue loyalty program payments to all members of a buying group if one member violates the terms of the loyalty program, essentially relying on the common threat to all members of the buying group for the violative actions of one. Furthermore, Corteva's loyalty program ties the loyalty rebate payments to each distributor's purchases of Corteva's Dithiopyr-containing products during an entire market year and withholds certain payments of rebates beyond the year for which the payment is made under the threat of forfeiture if the distributor should break ranks with Corteva's loyalty program in the future. This effectively makes it nearly impossible to break ranks for fear of losing substantial loyalty payments. To further ensure compliance with its loyalty programs and prescribed thresholds, and restrict generic competition, it is believed that Corteva also polices and electronically monitors the distributors' purchases and sales data regarding their purchases

and distribution of all Dithiopyr-containing products via required periodic electronic data exchange ("EDI") reports.

18. Corteva's long standing exclusivity loyalty agreements are designed to thwart, and have actually thwarted, RightLine's attempts to access the nation's most viable and cost-efficient distribution networks, thereby substantially lessening and foreclosing RightLine's ability to access the primary avenue of market entry for generic products and viably compete in the marketplace, significantly depriving RightLine of the opportunity to achieve minimum economies of scale necessary to be competitive, and enabling Corteva to maintain its monopoly and market power and charge supra-competitive prices for its Dithiopyr-containing products far above price competitive levels that would otherwise have come about for end users but for Corteva's loyalty programs, resulting in anticompetitive injuries to end-users.

## III. The Primary Critical Key Lines of Distribution

19. Dithiopyr-containing herbicide products for the turf and ornamental market in the United States are primarily sold through national and regional distributors, as well as an independent buying group, with expertise in the turf and ornamental market. These products are sold in both formulated end use product form, such as RightLine's Dithiopyr 2 EW and Corteva's Dimension products, and also in technical form to be blended with a fertilizer, including by distributors subject to Corteva's loyalty programs, and sold as a fertilizer product containing Dithiopyr. Upon information and belief, Corteva's loyalty programs apply to both formulated goods and technical sales. As many distributor customers who distribute fertilizer products containing Dithiopyr either blend technical Dithiopyr with fertilizers themselves or contract with fertilizer formulators to do so, these distributors ultimately decide which technical Dithiopyr product - generic or Corteva's branded - to purchase for such use, and in this regard, are also bound by Corteva's Dithiopyr loyalty program.

20. The distribution network for Dithiopyr-containing products is made up of eight large national distributors, a major independent buying group, and a smattering of smaller regional and local distributors scattered across the country.

21. The eight large national distributors and the independent buying group influenced by Corteva's loyalty programs are the primary distribution channels for the sale of Dithiopyr-containing products. Upon information and belief, they account for over 95% of the total amount of Dithiopyr-containing products sold in the United States turf and ornamental market, serving as the critical market channel between manufacturers and a highly fragmented end-user customer base made up of multitudes of, *inter alia*, golf courses, turf management professionals, sod farms, and nurseries across the country.

22. Selling through these distributors and independent buying group is the most efficient and cost-effective way for a turf-protection product supplier, such as RightLine, to reach end-user customers. The distributors and independent buying group comprising the primary channel of distribution for Dithiopyr-containing products are patronized by end-user customers purchasing turf products because they, *inter alia*, distribute a wide range and comprehensive line of products, which includes, but is not limited to Dithiopyr-containing products, to meet end-user customer needs so end-users do not have to go to multiple sources to meet their overall needs; provide additional value-added services for end-user purchasers, such as local warehousing with significant inventories and consequent quick product delivery; possess technical product and application of product expertise, offering technical training and support to end-user customers; and offer end-users various purchasing benefits such as web-based ordering, stream-lined single-source billing, and credit and payment term benefits. Many of these same distributors purchase products from Rightline but are prevented from purchases Dithiopyr-containing products by Corteva's loyalty program.

23. Few smaller local and regional distributors have the resources to provide such value-added services and benefits to attract end-user customers like those provided by the eight national distributors and independent buying group, and thus they do not provide viable efficient alternative distribution channels for RightLine or other generic producers to reach and penetrate the Dithiopyr herbicide turf and ornamental market and compete effectively.

24. As a result, the smaller local and regional distributors represent less than five percent of the sales of Dithiopyr. Thus, in foreclosing RightLine and other generic manufacturers from key distribution channels accounting for the vast majority of the market, Corteva's exclusivity agreements with the national and regional distributors and buying group comprising these primary channels of distribution have effectively relegated RightLine and other generic suppliers to inefficiently compete among themselves for a very small portion of the market that is not bound by Corteva's loyalty agreements. And, to do so, requires fighting through a smattering of smaller local and regional distributors lacking the economies of scale of, and having much smaller markets than, the nation's primary channels of distribution. And then, selling solely to local and regional distributors carries with it such sales volume and shipping inefficiencies that local and regional distributors do not typically purchase enough units of RightLine product to deliver in cost-efficient pallet quantities. Likewise, direct sales to end-users are considerably more costly and less efficient than selling to national distributors and, given the realities of the marketplace, direct marketing and sales to end-users are not a viable or practical alternative way for RightLine and other distributors of other generic products to compete. Meanwhile, Corteva wrongly enjoys the anti-competitive benefit of locking up a virtual competition-free line of the commercial marketplace that accounts for virtually all Dithiopyr sold in the United States turf and ornamental market. As a result, RightLine, as well as other generic distributors of Dithiopyr containing products are substantially foreclosed from the market with the

result that Corteva's products are sold at supra-competitive prices, which in most cases are as much as 35% more expensive than the equivalent products offered by RightLine.

## IV. Illustrative Effects of Corteva's Exclusionary Conduct

25. In RightLine's efforts to market its generic Dithiopyr 2EW product, RightLine has received direct communications from various distributors illustrating and evidencing the anti-competitive effects and coercive nature of Corteva's loyalty program strategy and its resulting substantial foreclosure of RightLine from the nation's primary channel of distribution and the resulting substantial lessening of competition.

26. For example, on Friday, December 1, 2023, before Rightline's Spring 2024 launch of its generic Dithiopyr 2EW product, RightLine reached out by e-mail to the Turf Division of one of the nation's leading distributors of herbicides for golf courses and turf managers to discuss that distributor's potential distribution of RightLine's new lower-cost generic alternative to Corteva's formulated Dithiopyr product. The distributor's e-mail response rejecting RightLine's outreach was direct and immediate, coming back that same day and stating: "We have a loyalty program for Corteva. Thanks for the info. Have a good weekend."

27. At the time that this distributor declined to talk with RightLine about including RightLine's generic alternative Dithiopyr 2 EW product in its product offerings because of Corteva's loyalty program, the distributor was also a member of a nationwide buying group network of approximately 20 distributors for the Turf and Ornamental market in the United States, most of whom, on information and belief, were also subject to Corteva's loyalty program.

28. Later that Spring, on Friday afternoon, May 3, 2024, RightLine sent an e-mail to another distributor who was also a member of the same buying group, as well as a distributor of other RightLine generic products that did not contain the active ingredient Dithiopyr. RightLine's e-mail

forwarded an updated price list for those products and also advised that RightLine had added some new products to its line including its generic Dithiopyr 2EW product that RightLine put on the market that Spring. Consistent with the other distributor's earlier rejection in December 2023 of RightLine's outreach because of Corteva's exclusionary loyalty program, this other distributor also told RightLine that it could not sell RightLine's generic Dithiopyr 2 EW product because of Corteva's loyalty program, directly stating in its e-mail response on Monday, May 6, 2024: "Thanks for the update. We can NOT sell any generic Corteva because of our loyalty agreement." (Capitalized emphasis in original).

29. Likewise, in February 2026, the extraordinary exclusionary nature of Corteva's loyalty program, and its adverse impact on end-user consumers, was again demonstrated when RightLine received a message from an end-user (a lawn care services company) advising that the end-user was not able to purchase RightLine's generic Dithiopyr product through normal channels of distribution because of Corteva's loyalty program. The message could not have been clearer about the exclusionary impact of Corteva's loyalty program, stating: "I'm interested in purchasing Dithiopyr but my suppliers will not sell it to me because [of] an agreement with Corteva."

30. And, just this past May 2026, when RightLine sent an e-mail outreach to yet another distributor, who distributes herbicides for golf courses and lawn maintenance companies, among other end-users, it received the following response: "Corteva has an agreement to keep dealer's [sic] from selling generics. That will be a challenge for you." And when RightLine then inquired if the agreement was voluntary for the distributor, the distributor replied: "I would assume all Corteva distributors."

31. The coercive nature of Corteva's loyalty program is also illustrated by two remarkable circumstances that occurred when a customer of a distributor of RightLine products other than its

generic Dithiopyr product asked the distributor for generic Dithiopyr. The distributor (Distributor 1) was also a distributor of Corteva products and a participant in Corteva's loyalty program. On the first occasion, a salesperson for Distributor 1 ordered generic product from RightLine for the customer. Distributor 1, not wishing to lose the monetary benefits of Corteva's loyalty program, threatened to fire this salesperson if he acquired any RightLine product again due to the adverse impact such acquisition could have on its receipt of loyalty rebate payments from Corteva. On the second, which occurred in late May 2026, the same Distributor 1 asked another distributor (Distributor 2) to make a purchase of RightLine's generic Dithiopyr 2 EW product for the customer and have RightLine ship it direct to an end use applicator business location in Georgia, thereby keeping record of the purchase out of Distributor 1's purchasing system and warehouse so it would not be subject to disclosure to Corteva through Corteva's monitoring of loyalty program purchases. Distributor 2's only purchase relationship with RightLine was the purchase of a single case of Dithiopyr containing products and shipping direct to end users on behalf of Distributor 1 to avoid Distributor 1 from losing Corteva loyalty program payments. Selling individual cases of product, however, is simply not a viable option to sustain a business or a line of products.

32. Each of these examples show the exclusionary effect of Corteva's loyalty programs.

### V. The FTC's Lawsuit Challenging Similar Loyalty Programs Against Syngenta and Corteva and FMC's Shift in Exclusionary Practices.

33. In September 2022 the Federal Trade Commission and one dozen states filed an antitrust enforcement action against Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC (collectively, "Syngenta"), and Corteva for their respective anticompetitive practices in the agricultural industry related to their loyalty programs, which had the intended and actual effect of excluding generic products from the marketplace, harming competition and consumers. *See FTC, et al. v. Syngenta Crop Protection, AG, et al.*, 22-cv-828 (M.D.N.C.).

34. The loyalty programs challenged by the FTC are nearly identical to the program employed by Corteva here for Dithiopyr-containing products except that the programs at issue in the FTC case are applicable to different agricultural pesticides manufactured by Syngenta and Corteva, respectively.

35. The FTC lawsuit alleges that the loyalty programs were "expressly design[ed] to maintain [the Defendants] ability to price [their] products above competitive levels while still retaining large market shares" and that the result of the loyalty programs was that Corteva and Syngenta "enjoy[ed] outsize profits during the 'post-patent' period—when prices would otherwise fall substantially." FTC Complaint at ⁋ 9. The lawsuit goes on to state that without the loyalty programs, the "Defendants would [have] face[d] increased generic competition [which] would lead to increased choice and lower prices for American farmers." [*Id.* at ⁋ 11]. This lawsuit remains pending with discovery appearing to have been completed.

36. Corteva's actions here with respect to Dithiopyr-containing products in the Turf & Ornamental market are illegal and cause anticompetitive injury to the consumer market and generic distributors, including RightLine, in much the same way as alleged by the FTC in the agricultural market.

## CAUSES OF ACTION

### COUNT I: UNREASONABLE RESTRAINTS OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

37. The preceding paragraphs are realleged and incorporated as fully stated herein.

38. Section 1 of the Sherman Act prohibits any contract that unreasonably restrains trade or commerce. 15 U.S.C. § 1.

39. Each of Corteva's loyalty program agreements and arrangements with its distributors and distributor buying groups is a contract between that party and Corteva, and such contract

constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, causing anticompetitive injury to RightLine's business and property, as well as to the turf & ornamental market as a whole, through the resulting supra-competitive prices charged to end user purchasers of Corteva's Dithiopyr-containing products than would otherwise prevail in the presence of unrestrained competition and unrestrained end user access to generic alternatives though the nation's primary and most efficient and cost effective channels of distribution.

WHEREFORE, RightLine prays for actual and trebled damages, attorneys' fees, costs, and any other such relief as supported by the law and the evidence.

**COUNT II: UNLAWFUL CONDITIONING OF PAYMENTS IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT (25 U.S.C. § 14)**

40. The preceding paragraphs are realleged and incorporated as fully stated herein.

41. Section 3 of the Clayton Act prohibits "mak[ing] a sale or contract for sale of goods ... or discount from, or rebate upon, such price on the condition, agreement, or understanding that the ... purchaser thereof shall not use or deal in the goods of a competitor ... where the effect may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14.

42. Corteva, through its loyalty program agreements and arrangements, has provided, and continues to provide, payments in the form of rebates on the sale of Dithiopyr products on the condition, agreement or understanding that the distributors not acquire, use, or resell the Dithiopyr products of generic competitors, including RightLine.

43. This conditioning of payments substantially lessens competition and/or maintains a monopoly in the market for the sale of Dithiopyr-containing products to the United States turf and ornamental market and, within that market, their sale through the nation's primary and most efficient and cost-effective channels of distribution that account for over 95% of the Dithiopyr-containing

products sold in the United States. There is no meaningful economic or functional substitute to Dithiopyr given its broad spectrum, fast acting nature, and residual soil presence combined with both pre- and post-emergent control of major turf weeds, such as crabgrass. As a result, notwithstanding the vast price difference between generic and branded Dithiopyr sold by Corteva, distributor customers still refuse to acquire generic Dithiopyr because of the Corteva loyalty program.

WHEREFORE, RightLine prays for actual and trebled damages, attorneys' fees, costs and any other such relief as supported by the law and the evidence.

**COUNT III: UNLAWFUL MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)**

44. The preceding paragraphs are realleged and incorporated as fully stated herein.

45. At all relevant times, Corteva knowingly, willfully and wrongfully maintained monopoly power in the relevant market for the sale of Dithiopyr-containing products to the turf and ornamental market through an anti-competitive and exclusionary scheme that included illegal loyalty programs and the enforcement of the terms thereof, causing injury to RightLine's business or property, as well as to the turf and ornamental market as a whole through the resulting supra-competitive prices charged by Corteva for Dithiopyr-containing products prices to end-user purchasers for Corteva's Dithiopyr-containing products than would otherwise prevail in the presence of unrestrained competition and foreclosure of end user access to generic alternatives though the nation's primary and most efficient and cost effective channels of distribution that account for over 95% of the amount of Dithiopyr-containing products sold in the United States.

46. Corteva's conduct has resulted in an inexplicable near total monopoly in the primary distribution channel on a product whose patent is long-expired and has no viable alternative. This near total monopoly has been severely injurious to the generic suppliers of Dithiopyr, including

RightLine, has foreclosed competition for sale of Dithiopyr to end-users, and has substantially reduced the incentive for generic manufacturers to invest in product innovation.

WHEREFORE, RightLine prays for actual and trebled damages, attorneys' fees, costs, and any other such relief as supported by the law and the evidence.

## PRAYER FOR RELIEF

RightLine prays for relief as follows:

(1) RightLine should be awarded damages in an amount to be proven at trial;

(2) RightLine should be awarded damages in an amount to be determined, and trebled as provided for in Section 4 of the Clayton Act, 15 U.S.C. § 15;

(3) RightLine should be awarded reasonable attorneys' fees and costs of this suit as provided for in Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

(4) The Court should enter a permanent injunction enjoining Corteva from continuing the illegal conduct proven at trial as provided for by Section 16 of the Clayton Act, 15 U.S.C. § 26; and

(5) Any other relief that the Court deems appropriate and reasonable.

## JURY TRIAL DEMAND

RightLine demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Daniel A. Griffith
Daniel A. Griffith (#4209)
Whiteford, Taylor & Preston, LLP
600 North King Street
Suite 300
Wilmington, DE 19801
302.357.3254
dgriffith@whitefordlaw.com

William F. Ryan, Jr. (*pro hac to be filed*)
Steven E. Tiller (*pro hac to be filed*)
Whiteford, Taylor & Preston LLP
Seven Saint Paul Street
Suite 1500
Baltimore, Maryland 21202-1636
410.347.8741 (direct William F. Ryan, Jr.)
410.347.9425 (direct Steven E. Tiller)
wryan@whitefordlaw.com
stiller@whitefordlaw.com

*Attorneys for Plaintiff, RightLine, LLC*

4919-4297-6944, v. 10